Filed 8/6/21 Pour v. City of Los Angeles CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT
### DIVISION THREE

| | |
|---|---|
| LAHER POUR, | B303925 |
| Petitioners and Appellants, | (Los Angeles County Super. Ct. No. BS174592) |
| v. | |
| COUNTY OF LOS ANGELES, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |
| Respondent. | |

It is ordered that the opinion in this matter, filed July 16, 2021, is modified as follows:

1. Footnote 2, on p. 3, is modified to read as follows: "The owners were defendants in the trial court proceedings, but they did not file a respondents' brief on appeal. On August 2, 2021, the owners filed a petition for rehearing, which the court has considered."

2. After the citation following the first sentence of the first full paragraph on p. 23, a footnote is added, to read as follows:

"*Godshalk v. City of San Diego* (1971) 16 Cal.App.3d 459, 467, cited in the owners' petition for rehearing, does not suggest a different conclusion. In *Godshalk*, the court held it would not presume that certificates of three physicians were before a city

board when it directed a payment to the plaintiff of an industrial disability pension because "[t]he record is sufficiently clear that Board of Trustees had only one medical statement before it. Plaintiff in his brief does not assert otherwise." (*Id.* at p. 469.) In the present case, in contrast, the record does not clearly indicate whether or not a temporary certificate of occupancy was issued prior to October 1, 1978, and the tenants have urged that the present record supports the presumption that a temporary certificate of occupancy was so issued."

3. Footnotes 9 and 10, on pages 24 and 26, are renumbered accordingly.

The petition for rehearing is denied. There is no change in the judgment.

_____

EDMON, P.J.                                    KALRA, J.*

I would grant the petition for rehearing.

_____

EGERTON, J.

_____

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/16/21  Pour v. City of Los Angeles CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LAHER POUR et al.,<br><br>        Petitioners and Appellants,<br><br>    v.<br><br>CITY OF LOS ANGELES,<br><br>        Respondent. | B303925<br><br>(Los Angeles County<br>Super. Ct. No. BS174592) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Reversed with directions.

Noah Grynberg, Tyler Anderson, Gina Hong and Sarah Walkowicz, for Petitioners and Appellants Laher Pour, Nelya Feygin, Jorge Lopez and Tarzana Gardens Tenants Association.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus and Blithe S. Bock, Assistant City Attorneys and Shaun Dabby Jacobs, Deputy City Attorney, for Respondent.

This appeal concerns an apartment building first approved for occupancy in 1978 (the property). At all times between 1979 and 2016, the City of Los Angeles (the City) classified the property as subject to the Los Angeles Rent Stabilization Ordinance (RSO) (L.A. Mun. Code,[1] § 151.00 et seq.), which regulates rent increases on residential properties approved for occupancy prior to October 1, 1978. In 2017, however, the City exempted the property from the RSO after entering into a settlement agreement with the property's owners that designated the property "at all times and forever exempt from the RSO."

Several of the property's tenants and its tenants' association sued the City and the owners, seeking, among other things, a writ of mandate directing the City to enforce the RSO with respect to the property, and a declaration that the settlement agreement was void as against public policy. The trial court voided the settlement agreement but concluded the tenants had not established that the property was subject to the RSO, and it thus denied the petition for a writ of mandate.

We reverse. Under the plain language of the RSO, a property is subject to rent control if, among other things, a building permit was issued prior to October 1, 1978. Here, a building permit for the property was issued in July 1977, well prior to the RSO's effective date. Moreover, applying the RSO to the property creates no conflict with state law, as the City asserts, because the property was not newly subjected to rent control after 1995. Accordingly, we conclude that the property is

---

[1]     All subsequent undesignated statutory references are to the Los Angeles Municipal Code.

2

subject to the RSO, and the trial court erred in denying the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants Laher Pour, Nelya Feygin, and Jorge Lopez are tenants living in the property, a 38-unit apartment building located in Tarzana. Appellant Tarzana Gardens Tenants Association is an association of tenants living at the property. Jerie Petrosian, as trustee of the Petrosian Trust, and JKP Apartments are the property's owners.[2] Respondent City is the municipality within which the property is located.

### A. *Construction and Occupancy of the Property*

On July 11, 1977, the City issued a building permit for the construction of an apartment building on the property. The following month, the City issued a building permit for the construction of a swimming pool.

On February 16, 1978, the builder submitted a "request for modification of building ordinances" seeking a temporary certificate of occupancy pending completion of electrical work on the swimming pool. The City granted the request the same day. However, the City's files do not contain a temporary certificate of occupancy.

The City issued a final certificate of occupancy for the property on October 16, 1978.

---

[2]  The owners are defendants in the trial court proceedings, but are not parties to this appeal.

*B.    The RSO*

1.    <u>Pre-2017 Versions</u>

The City adopted the RSO on March 15, 1979.  For all properties subject to its provisions, the RSO sets out the maximum rents landlords are permitted to charge tenants.

The definition of properties subject to the RSO has been amended several times.  As adopted in 1979, the RSO applied to "[a]ll dwelling units, efficiency dwelling units, guest rooms, and suites in the City of Los Angeles," but excepted housing accommodations "located in a structure for which a certificate of occupancy was first issued after October 1, 1978."  In 2011, the City Council added the following sentence to the definition of RSO properties, apparently in order to include some older properties built before the City routinely issued certificates of occupancy:  "If the property was occupied for residential purposes prior to October 1, 1978 and a Certificate of Occupancy for the subject building was never issued or was not issued until after October 1, 1978, the housing accommodation shall be subject to the provisions of this Chapter if relevant documentation, such as a building permit, establishes that the building was first occupied for residential purposes prior to October 1, 1978."  (Former § 151.02.)

City representatives asserted in the present proceedings that although the initial version of the RSO facially embraced only those properties for which a certificate of occupancy had issued prior to October 1, 1978, the City has always considered a property subject to the RSO if it was "approved for occupancy" prior to October 1, 1978, whether or not a certificate of occupancy had been issued for the property.  As the City Attorney told the court, it was the City's view that the RSO had always covered "all

4

the properties that were either *used or capable of being used*" before October 1, 1978.  (Italics added.)

> 2.      2017 Amendments

The City adopted the current version of the RSO in 2017. Currently, section 151.02 of the RSO defines properties subject to the RSO as follows:  "Housing accommodations, located in a structure for which the first Certificate of Occupancy was issued after October 1, 1978, are exempt from the provisions of this chapter.  If the structure was issued a Certificate of Occupancy, including a Temporary Certificate of Occupancy, on or before October 1, 1978, the housing accommodation(s) shall be subject to the provisions of this chapter.  If the property was issued a building permit for residential purposes at any time on or before October 1, 1978, and a Certificate of Occupancy for the building was never issued or was not issued until after October 1, 1978, the housing accommodation shall be subject to the provisions of this chapter."  Thus, under the current version of the RSO, a property is subject to rent stabilization if, on or before October 1, 1978, the City issued *either* (1) a certificate of occupancy, (2) a temporary certificate of occupancy, or (3) a building permit.

The 2017 amendments were adopted at the recommendation of the Housing and Community Investment Department (HCID), to "provide clarity for both tenants and landlords on the administration of the City's rent stabilization and housing code enforcement programs."  They were "technical amendments"—i.e., amendments intended to "improve the language in the ordinance to make it more clear or easier to administer," not to "change the substance of any provision in the ordinance."  As relevant here, HCID noted that many owners had taken the position that a property was not subject to the RSO if a

5

temporary certificate of occupancy for a property was first issued prior to October 1, 1978, but a final certificate of occupancy did not issue until after that date.  HCID disagreed, explaining that "[f]or purposes of determining whether a rental unit is subject to the RSO, *Temporary Certificates of Occupancy are a subcategory within the broader definition of Certificates of Occupancy,* which allow the legal habitation of a building and permit the occupancy of the units. . . .  [¶] . . . [¶]  The [HCID], therefore, recommends amending the sixth exemption in the definition of 'Rental Unit' in Section 151.02 of the RSO to affirm that *a Temporary Certificate of Occupancy, when issued, is the first Certificate of Occupancy.*" (Italics added.)[3]

HCID also recommended amending the definition of "rental unit" to include units for which a building permit was issued prior to October 1, 1978, but a certificate of occupancy had never been issued or was issued after the relevant date.  HCID explained:  "The current language in 151.02 (exemption number 6) in the definition of 'rental unit' references 'the housing accommodation shall be subject to provisions of this Chapter if relevant documentation, such as a building permit, establishes that the building was first occupied for residential purposes . . . .' However, Certificates of Occupancy do not establish when a rental unit is occupied, but when a housing accommodation is approved for residential occupancy.  The application of the RSO is not based on the 'physical occupancy' of a structure but on when a building may be legally occupied for residential purposes.

---

[3]     Consistent with HCID, in this opinion we will use the term "certificate of occupancy" as an umbrella term to refer to both temporary and final certificates of occupancy.

6

[¶] [HCID], therefore, recommends a further amendment rephrasing the second part of the sixth exemption in the definition of 'Rental Unit.'"

C.   *The Owners' Request for Reclassification of the Property*

It is undisputed that the property's original owners registered the property with the City in 1979, and that the City has classified the property as subject to the RSO since the ordinance's inception. Thus, when JKP Apartments and the Petrosian Trust (collectively, the owners) purchased the property in 1994, they did so subject to the RSO. They have annually paid RSO fees since that time.

In May 2016, the owners submitted a request to HCID to make a finding that the property was not subject to the RSO because the property's first certificate of occupancy "dates October 16, 1978." On May 23, 2016, HCID responded that having conducted a review of its property records, it concurred with the owners that the property was not subject to the RSO, and thus the City's records "[would] be adjusted to reflect this RSO exemption for 38 units." In June 2016, the owners informed their tenants of the City's determination and that rents would be increased as of September 2016.

On July 1, 2016, after receiving complaints from some of the property's tenants, HCID advised the owners that on further review, it had determined the property was subject to the RSO. It said: "Property records indicate that a *Temporary Certificate of Occupancy* 1977VN60384 was issued February 16, 1978. Therefore, all of the dwelling units on this property are subject to the provisions of the RSO. Please note that it is the first issued Certificate of Occupancy for a structure issued by the City of

7

Los Angeles which is relevant to the determination of whether or not a rental unit is subject to the RSO." (Italics added.)

## D. The Settlement Agreement

The owners submitted a claim for damages to the City in April 2017. They asserted that the document identified by the City as a temporary certificate of occupancy was not, in fact, a temporary certificate of occupancy, but was instead a " 'request for modification of building ordinance.' " The owners sought damages in excess of $25,000 and a determination that the property was not subject to the RSO.

On July 31, 2017, the City and the owners entered into an agreement settling the owners' claims (the settlement agreement). In it, the City "contend[ed] [the] evidence supports the contention that the Subject Property was issued a Temporary Certificate of Occupancy on February 16, 1978 and that, accordingly, the Subject Property is subject to the RSO." Nonetheless, the owners and the City "now mutually desire to compromise and settle all of their respective claims and contentions relating to their rights and obligations as raised in the Claim." Accordingly, the parties agreed that the City "shall vacate its prior determination as to the RSO status of the Subject Property," and "the Subject Property shall be at all times and forever exempt from the RSO." In exchange, the owners agreed to waive "any and all claims against the City with respect to the City's determination as to the RSO status of the Subject Property."

Following execution of the settlement agreement, the owners raised appellant Pour's monthly rent from $592 to $838, appellant Feygin's monthly rent from $1,184 to $1,434, and appellant Lopez's monthly rent from $1,060 to $1,310.

8

*E.    The Tenants' Petition for Writ of Mandate*

On August 1, 2018, the individual appellants and the tenants' association (collectively, the tenants) filed a verified petition for writ of mandate and complaint for declaratory and injunctive relief and damages against the City and the owners. The petition alleged that the property was subject to the RSO because both a temporary certificate of occupancy and a building permit were issued prior to October 1, 1978.  As against the City, therefore, the petition sought a writ of mandate and declaratory relief invalidating the settlement agreement and designating the property subject to the RSO.[4]

In their opening brief in support of the petition, the tenants asserted that under the operative version of the RSO, a property is subject to rent stabilization if the City issued a permanent certificate of occupancy, a temporary certificate of occupancy, or a building permit on or before October 1, 1978.  In the present case, it was undisputed that the City issued a building permit for the property in July 1977, and thus the property was subject to the RSO pursuant to the ordinance's building-permit clause.  Alternatively, the tenants urged that the property was subject to the RSO under the temporary-certificate-of-occupancy clause, because although no temporary certificate of occupancy appeared in the City's file, the grant of a request for a temporary certificate of occupancy on February 16, 1978 was evidence that a temporary certificate of occupancy had, in fact, been issued.  The

---

[4]    As against the owners, the tenants asserted causes of action for declaratory relief, intentional and negligent infliction of emotional distress, negligence, and unfair business practices. Those causes of actions are not at issue in this appeal.

9

tenants contended: "The City has testified that in 1978, upon receipt of the Request [for a temporary certificate of occupancy], an inspector would have to verify that the building in question satisfied certain life and safety regulations. There is no reasonable explanation regarding why the City would have checked 'Granted' on the Request rather than 'Denied' if an inspector had not already performed the required verification. . . . [¶] Indeed, even assuming *arguendo* that a separate temporary [certificate of occupancy] was never issued for the Property, the fact that the Request was granted should be sufficient to establish that the Property is covered by [the RSO]. . . . There is no way to read the 'grant' of a 'request' other than as a statement that the relief sought in the request was granted to the applicant."

In opposition to the writ petition, the City urged, first, that if the 2017 amendment were read to subject to the RSO any property for which a building permit had been issued prior to October 1, 1978, the amendment would conflict with the Costa-Hawkins Rental Housing Act (Costa-Hawkins), Civil Code section 1954.50 et seq. Among other things, Costa-Hawkins prohibits local jurisdictions from subjecting to rent control properties already exempt from rent control as of February 1, 1995. The City asserted that because, as of Costa-Hawkins's effective date, the RSO applied only to properties that were legally occupied for residential purposes prior to October 1, 1978, the City could not extend the RSO to any additional properties, including properties for which a building permit had been issued, but were not legally occupied before October 1, 1978. The City thus urged the court to read the 2017 amendment narrowly to avoid a conflict with Costa-Hawkins.

10

The City also argued that there was no evidence a temporary certificate of occupancy had been issued for the property prior to October 1, 1978. It asserted: "The Request for Modification of Building Ordinances does not constitute issuance of the actual certificate—an official act that is performed by DBS [Department of Building and Safety]. [Citations.] Only the official certificate issued by DBS provides a property owner the legal right to occupy its building. The Request For Modification of Building Ordinances does not confer any such right to a property owner."[5]

In their reply brief, the tenants disagreed that properties were subject to the RSO only if they were "actually occupied" prior to October 1, 1978, but they nonetheless offered evidence that the property had been occupied prior to the relevant date.

On July 19, 2019, the owners filed a sur-reply and request to strike the tenants' evidence of actual occupancy. The owners asserted that the tenants should not be permitted to introduce new evidence in their reply brief, and the trial court should not consider evidence not previously presented to HCID. The owners thus asked the court to strike the tenants' new evidence and deny the writ petition.

The trial court held a hearing on the writ petition on July 24, 2019. The owners' counsel argued at the hearing that, both before and after the 2017 amendments to the RSO, a property was subject to the RSO only if it was "fit for occupancy" prior to October 1, 1978. The City's attorney similarly contended,

_____

[5]     The owners made similar arguments in opposition to the tenants' writ petition. However, because the City is the only respondent, our focus in this opinion is on the City's contentions.

11

asserting that the RSO embraced only properties that were "either used or capable of being used" prior to October 1, 1978. Counsel thus urged that expanding the RSO to also cover properties for which a building permit had been issued prior to October 1, 1978 violated Costa-Hawkins.

The court noted that the City had considered the property subject to the RSO until 2016, and inquired how, on that record, continuing to apply the RSO to the property could violate Costa-Hawkins. This colloquy followed:

"[Court:] What I want to ask, [City Attorney] Moore, is: in order to have determined that the property was subject to the RSO up until 2016, the City would have been operating under the old law . . . . [¶] The City had to have made that determination to subject that building to the RSO prior to 2016 when it changed its position. Would you agree with that? [¶] . . . [¶]

"Mr. Moore: Not to muddy up the waters even more, . . . but the property was initially determined to be subject to the RSO at the outset. So when the ordinance was passed, it's been under the RSO that entire time . . . . At that time, the only language was part 1, whether a C of O was issued before or after October 1, '78, essentially. [¶] We don't know—I can represent nobody at the Department has records of a determination being made. There is—at that time, though, it is known that owners were asked to register properties. [¶] . . . [The owners] would have been receiving annual invoices for the RSO and would have been subject to the RSO. Once it was in, it was always in.

"The Court: Did it become in with somebody registering the property?

"Mr. Moore: We can't say for certain, but that it—at the time the ordinance was passed, that was how properties basically

came under the auspices and the monitoring was they were registered at that time.  [¶]  Again, we don't—we're kind of guessing here, but I can say that the determination was from the outset and it does precede [the 2017 amendments]."

F.	*August 15, 2019 Remand Order*

On August 15, 2019, the trial court issued an order making findings and remanding the matter to HCID.  With regard to the application of the RSO, the court found as follows:

*Temporary certificate of occupancy ("category two"):*  The court found that although the City granted the builder's request for a temporary certificate of occupancy, there was no evidence the City ever actually *issued* a temporary certificate of occupancy. The court explained that in 1978, the procedure for obtaining a temporary certificate of occupancy required a property owner to submit a request for modification, after which a City inspector would indicate whether the property satisfied life and safety requirements.  If those requirements were met, the Department of Building and Safety would issue a temporary certificate of occupancy.  In the present case, "The [request for a temporary certificate of occupancy] appears to have been submitted by the Property's owner on February 16, 1978, the same day the City granted the Request.  It is not clear from the deposition testimony whether a temporary Certificate of Occupancy necessarily follows—as a clerical function—where the City has granted a Request.  If, as the deposition testimony seems to suggest, some inspection by the City must follow where a Request is granted, the court has no evidence such an inspection occurred or the results of such an inspection, even assuming one did occur."  Thus, the court said, "Petitioner has not persuaded the

13

court that the evidence suggests the Property is subject to the RSO as a Category Two property."

*Building permit ("category three")*:  The court found the undisputed evidence established that a building permit for the property was issued on July 11, 1977, and thus the property came within the plain language of the building-permit clause of the RSO.  The court agreed with the City, however, that as broadly read, that clause conflicted with Costa-Hawkins.  Accordingly, the court found, "section 151.02 contains a latent ambiguity.  The language in the provision for Category Three buildings requires a determination that the property was*, in fact,* occupied prior to October 1, 1978 without regard to the Certificate of Occupancy.  Reading the provision in such a fashion is consistent with legislative intent and harmonized the RSO with state law." (Italics added.)

With regard to actual occupancy, the court noted that the tenants had presented evidence that the property had been occupied prior to October 1, 1978.  However, the tenants had never had the opportunity to present that evidence to HCID, and HCID had never considered it.  The court therefore remanded the matter to HCID to "consider whether the Property falls within the RSO based on [the tenants'] evidence as well as any other relevant evidence HCID may elect to receive. . . .  Upon completion of HCID's review, the matter shall return to this court for further proceedings on this petition."

*G.     HCID's Determination Following Remand*

On November 15, 2019, HCID issued a finding that, having conducted a further review of evidence submitted by the tenants

14

and the owners,[6] its conclusion "continues to be that this property is *not* subject to the RSO. Although a large number of documents have been submitted by the Los Angeles Center for Community Law and Action, they essentially do not demonstrate that the units at the property were first *approved, authorized, or used for occupancy* on or before October 1, 1978."

### H. Further Proceedings; Court's Order Denying Writ Relief and Granting Declaratory Relief

The court held further hearings on November 20 and December 4, 2019, during which it asked the parties what they believed the next steps should be. The City contended that it had complied with the court's August 15 order and had found the property not subject to the RSO. Thus, it urged, "there is nothing left but for the Court to rule that the settlement agreement entered into by and between the City and the Owner Defendants is *not* void and unenforceable, and that Petitioners' Writ is therefore denied. Importantly, should Petitioners wish to challenge the sufficiency of the City's determination of November 15, 2019, such would have to occur in a new, separate action as Petitioners would be required to allege [their] arguments in a new Petition, which Petition the City would be given the opportunity to respond to in due course."

---

[6] The evidence presented to HCID is not part of our appellate record. HCID purported to summarize the evidence in its November 15, 2019 letter, which *is* in our record, but because the evidence itself is not before us, we cannot determine whether HCID's summary is consistent with the evidence. We also have no information about the extent of the investigation conducted by the landlord's investigator, or whether the tenants had the opportunity to respond to the investigator's findings.

The tenants disagreed with the City's position and urged the court to hold a further hearing to review HCID's November 15 decision. They contended: "There is no basis in law for this Court to permit the City to make a finding regarding the [RSO] status of the Property in order to adjudicate the petition. The City does not have an administrative process for such a determination, and there is nothing in any law or regulation that states that the City is the entity that must make the determination in the first instance. This Court should be the arbiter regarding the [RSO] status of the property, and regarding whether the settlement agreement is void on its face. If this Court believes that Petitioner must somehow show that human beings lived at the property prior to October 1, 1978, in spite of the plain language of the [RSO], then Petitioners should have the opportunity to provide this Court with such evidence with more lead time than the few weeks Petitioners had between the date the City took its position in its opposition brief and the date on which the Petitioners' reply brief was due. Petitioners and their counsel have found and spoken with people over the last few months that they identified to the City as having lived at the Property prior to October 1978, and who have confirmed to Petitioners that they indeed lived at the Property prior to October 1978. Petitioners should not be forced to file a new [Code of Civil Procedure section] 1085 petition and wait months or years to present this evidence to this Court in a separate petition."

After taking the matter under submission, the trial court issued an order denying writ relief and granting declaratory relief on December 27, 2019. The December 27 order repeated several of the court's earlier findings—namely, that the issuance

16

of a building permit, alone, did not subject a building to the RSO, and the tenants had not established that the City issued a temporary certificate of occupancy in February 1978. With regard to *actual* occupancy, the court did not directly address the City's findings on remand, other than to conclude that "Petitioner[s] can receive no relief on [their] writ petition with respect to the City's determination that the building is not subject to the RSO."

The court reached a different result, however, with regard to the settlement agreement. The court rejected the City's contention that the settlement agreement could be void only if the property was subject to the RSO, explaining as follows: "The terms of the Settlement Agreement reflect the City's position, at the time of contracting, the Property was subject to the RSO—the plain language of the settlement agreement reveals the City's belief. Despite the City's understanding and position about the Property and the RSO, the City nonetheless agreed with [the owners] that the Property could be for now and 'at all times and forever exempt from the RSO.' This the City could not do as a matter of law . . . . [¶] . . . [¶] The RSO establishes what properties fall within its protection. The City and [owners'] attempt to exempt the Property from the applicability of the RSO by way of contract *after* the City determined the Property was subject to the RSO was an invalid, *ultra vires* act. . . . [¶] . . . [¶] Based on the foregoing, the court finds the Settlement Agreement between the City and [the owners] void."

The tenants timely appealed from the December 27, 2019 order.[7]

---

[7] An order denying a petition for writ of mandate is appealable. (*Martis Camp Community Association v. County of*

17

## DISCUSSION

On appeal, the tenants contend that the property is subject to the RSO because (1) the City issued a temporary certificate of occupancy for the property prior to October 1, 1978, and (2) the City issued a building permit for the property prior to October 1, 1978. They therefore urge that the writ petition should have been granted. Alternatively, the tenants contend the trial court erred in remanding the matter to the City for a determination of actual occupancy and then adopting the City's determination without inquiry.

The City contends the trial court properly concluded the property was not subject to the RSO because (1) although the City granted a request for a temporary certificate of occupancy, there is no evidence it ever *issued* a temporary certificate of occupancy, (2) the mere issuance of a building permit does not subject a property to the RSO without evidence of actual occupancy, and (3) HCID's finding that the property was not actually occupied prior to October 1, 1978 was not arbitrary or capricious.

As we discuss, under the plain language of the RSO, a building is subject to rent control if a building permit was issued prior to October 1, 1978. This provision does not conflict with Costa-Hawkins as applied to the property at issue in this case, and thus the City abused its discretion by declaring the property not subject to the RSO.

---

*Placer* (2020) 53 Cal.App.5th 569, 588, fn. 11; *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409 ["an order granting or denying a petition for an extraordinary writ constitutes a final judgment for purposes of an appeal"].)

18

# I.
## Legal Principles and Standard of Review

The tenants filed a petition for writ of ordinary (or "traditional") mandamus pursuant to Code of Civil Procedure section 1085. That section provides that a writ of mandate may be issued "by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person."[8]

" 'In determining whether to grant a petition for traditional mandamus, we review for an abuse of discretion. " ' "Abuse of discretion is established if the respondent [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." [Citations.]' [Citation.]" ' [Citation.] ' "In determining whether the agency complied with the required procedures and whether the agency's findings are supported by

---

[8] The parties agree that the proceeding before the trial court concerned traditional mandamus pursuant to Code of Civil Procedure section 1085 because although HCID's determination that the property was not subject to the RSO was adjudicatory, HCID was not required to hold an evidentiary hearing. (See, e.g., *Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 462−463 [administrative mandamus pursuant to Code of Civil Procedure section 1094.5 is appropriate to review only an administrative decision that is made "as the result of a proceeding in which by law a hearing is required to be given. . . ."].)

19

substantial evidence, the trial court and the appellate courts essentially perform identical roles. We review the record de novo and are not bound by the trial court's conclusions." ' " (*Mateel Environmental Justice Foundation v. Office of Environmental Health Hazard Assessment* (2018) 24 Cal.App.5th 220, 229 (*Mateel*); see also *Exxon Mobil Corp. v. Office of Environmental Health Hazard Assessment* (2009) 169 Cal.App.4th 1264, 1276 [same].) We also review de novo the trial court's legal conclusions, including its interpretations of statutes. (*Oakland Police Officers' Assn. v. City of Oakland* (2021) 63 Cal.App.5th 503, 512; *Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 944.)

## II.
## The City Erred in Finding the Property
## Is Not Subject to the RSO

As we have said, under the current version of the RSO, a property is subject to rent control if it "was issued a building permit for residential purposes at any time on or before October 1, 1978." (§ 151.02.) There is no dispute that a building permit was issued for the property on July 11, 1977, and thus the property comes within the plain language of the RSO.

Although the City concedes the property is within the RSO's plain language, it contends that if the RSO is read as broadly as its plain language suggests, it conflicts with state law—specifically, with Costa-Hawkins, Civil Code section 1954.50 et seq. The City asserts that prior to the 2017 amendments to the RSO, a property was subject to the RSO only if, before October 1, 1978, a certificate of occupancy had been issued for the property or the property was actually occupied. Thus, the City says, because Costa-Hawkins prevented local

20

public entities from expanding rent control after February 1, 1995, allowing a building permit alone to result in RSO inclusion would conflict with Costa-Hawkins because it would "improperly subject currently exempted properties to the restrictions of the RSO." For the reasons that follow, we do not agree.

Costa-Hawkins provides, among other things, that an owner of residential real property may establish rental rates for a dwelling free of rent control if "[i]t has a certificate of occupancy issued after February 1, 1995" or "[i]t has already been exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units." (Civ. Code, § 1954.52.) In other words, Costa-Hawkins exempts from rent control properties newly built after its effective date of February 1, 1995, as well as properties already exempted from rent control pursuant to local ordinance.

As we explained in *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, "[t]he legislative history of Costa-Hawkins indicates that the Legislature did not intend for Costa-Hawkins to affect the rights of tenants *who were already living in residential units subject to rent control.* (See Reynolds & Conner, Enrolled Bill Rep. on Assem. Bill No. 1164 (1995–1996 Reg. Sess.) July 27, 1995, p. 5 ['The intent of the sponsor is to permit the operation of rent controls that affect an existing tenant but to limit the ability of localities to control rent setting when rental housing is vacated.']; Assemblymember Hawkins, Floor Statement, Assem. Bill No. 1164 (1995–1996 Reg. Sess.) July 24, 1995, p. 3 [Costa-Hawkins 'still allows local governments to continue to protect current tenants from rent increases'].)" (*Id.* at p. 25, fn. 9, italics added.) Rather, Costa-Hawkins was intended to encourage *new*

*construction* to increase the residential housing supply. (*Burien, LLC v. Wiley* (2014) 230 Cal.App.4th 1039, 1047, italics added.) In short, Costa-Hawkins was intended to protect tenants currently living in rent-controlled properties from large rent increases, while ensuring that owners and builders of new properties were able to set rents at market rate to ensure the continued supply of new housing stock.

We perceive no conflict between the RSO and Costa-Hawkins as applied to the facts of this case. At issue here is a 40-year-old building in which tenants have been protected by rent control essentially since the building was first occupied in the late 1970's. Manifestly, the City did not newly designate the property as rent-controlled as a result of the 2017 amendments to the RSO—the property has always been treated as such. Indeed, the City conceded at the July 2019 hearing that "the property was initially determined to be subject to the RSO at the outset" and was treated as a rent-controlled property "that entire time." As a result, at all times between 1979 and July 2017, the City issued annual invoices for RSO fees, the owners paid RSO fees, and long-term tenants paid stabilized rents. The property therefore was *not* "already . . . exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units" (Civ. Code, § 1954.52)—to the contrary, the property had been determined to be *subject* to such an ordinance. Applying the RSO to this property, therefore, does not conflict with Costa-Hawkins.

Although the City acknowledges that the property had an RSO designation between 1979 and 1995, it urges that designation was in error, and thus that a current RSO designation creates a conflict with Costa-Hawkins. Not so. As

we have said, it has been the City's position that, under every version of the RSO, a property was subject to the RSO if it was "actual[ly] use[d]" or "fit for use" prior to October 1, 1978—that is, if prior to the relevant date, a temporary or final certificate of occupancy had been issued for the property or the property was actually occupied. Applying this definition to the present case, the City has suggested the property was improperly designated as subject to the RSO because the Department of Building and Safety *presently* is unable, more than 40 years after the fact, to determine when the property first received a certificate of occupancy or was actually occupied. In other words, the City's position is that in the absence of *current conclusive evidence* that a temporary certificate of occupancy was issued or the property was occupied prior to October 1, 1978, we should ignore 40 years of precedent and presume the property had *not* been issued a temporary certificate of occupancy and was *not* actually occupied.

The City's position runs counter to Evidence Code section 664 which creates a rebuttable presumption that an official duty has been regularly performed. (See Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"]; *American Chemistry Council v. Office of Environmental Health Hazard Assessment* (2020) 55 Cal.App.5th 1113, 1146 ["in the absence of evidence to the contrary, we presume regular performance of an official duty"]; *Thimon v. City of Newark* (2020) 44 Cal.App.5th 745, 760 [same].) As applied to the present case, Evidence Code section 664 requires us to presume, in the absence of contrary evidence, that the City properly performed its duty to determine that the property was subject to the RSO before designating it as such. The City has conceded that there is no such contrary evidence—that "nobody

23

at the Department has records" of the circumstances under which an RSO designation was made with respect to this property. On the present record, therefore, we must presume that in 1979—well prior to the passage of Costa-Hawkins—the property was properly determined to be subject to the RSO.[9]

This presumption is particularly appropriate in this case, because although there apparently is no one *currently* employed by the City who recalls when a certificate of occupancy was first issued and the property was first occupied, that would not have been the case when the City initially designated the property subject to rent control in 1979. Then, both the City and the original owner would have been aware of the relevant permitting and occupancy history—and the owner certainly would have objected to the property's designation as an RSO property if, as the City now suggests, a temporary certificate of occupancy had not issued or the property had not been occupied prior to October 1, 1978. The original owner manifestly did not do so—to the contrary, he or she registered the property with the City and annually paid RSO fees. On the present record, therefore, we will presume the City properly designated the property as an RSO

---

[9] We note that the electronic database to which the dissent refers, which apparently documents building permits dating back to 1926, could not have been contemporaneously maintained, but necessarily was created much later, when computers and the internet were widely available. Although we have no information about when this electronic database was created, it presumably was well after the 1970's. The absence of the reference to a temporary certificate of occupancy in the electronic database, therefore, tells us only that there was no temporary certificate of occupancy in the file at the time the file was scanned—*not* that such a document never existed.

24

property prior to Costa-Hawkin's passage in 1995, and thus that continuing to so designate it does not run afoul of Costa-Hawkins. (See also *Nortel Networks Inc. v. Board of Equalization* (2011) 191 Cal.App.4th 1259, 1277 ["The burden of demonstrating the invalidity of a regulation falls upon the party challenging it"].)

The City and the dissent contend that if the RSO is read as broadly as its plain language suggests—that is, if a rental property is subject to the RSO merely because a building permit was issued prior to October 1, 1978—then some properties not subject to rent control in 1995 will be subject to it today. Because this issue is not before us, we decline to consider it. It may be, as the City and the dissent suggest, that as applied to other properties, a broad reading of the 2017 amendment to the RSO conflicts with Costa-Hawkins. Because there is no conflict between the ordinance and the statute in this context of *this case*, however, the case is not a proper vehicle for resolving this issue. (See *People v. Murphy* (2001) 25 Cal.4th 136, 149 [defendant "who falls 'squarely within'" the reach of a statute may not challenge its vagueness "as it 'might be hypothetically applied to the conduct of others. . . .'"]; *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1095 [" 'The rule is well established . . . that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself and that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations' "]; *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 90 [" ' " 'petitioners cannot prevail by suggesting that in some future hypothetical

25

situation constitutional problems may possibly arise as to the particular *application* of the statute' " ' "].)

For all the foregoing reasons, applying the RSO to this property does not run afoul of Costa-Hawkins.  Accordingly, because the property is subject to the RSO under the ordinance's plain language as currently drafted, the trial court erred as a matter of law by denying the writ petition.[10]

---

[10]    Having so concluded, we need not consider whether the City issued a temporary certificate of occupancy for the property in February 1978, or whether the trial court erred by failing to review the City's determination that the property was not actually occupied prior to October 1, 1978.

## DISPOSITION

The order denying the petition for writ of mandate is reversed with directions to the trial court to enter a new and different order granting the petition and directing the City to enforce the RSO with respect to the property. The appellants are awarded their appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

I concur:

KALRA, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Egerton, J., Dissenting.**

I respectfully dissent.

I see nothing in the statutory language of the Costa-Hawkins Rental Housing Act[1] to support the notion that, if a property in fact was not subject to the RSO when the Act was passed, it can nevertheless be deemed subject to the RSO if the City and/or the owner mistakenly and erroneously believed it to be subject to the RSO at the time. Nor am I aware of any case that so holds.

Appellants haven't even made this argument. Instead, appellants' argument consists of two different assertions: (1) The property falls within the language of the RSO, as amended in 2017, because a building permit was issued on July 11, 1977; and (2) the 2017 amendment to the RSO did not "expand[ ] the universe of units covered by [the RSO]" so there's no Costa-Hawkins Act problem. These two assertions are plainly inconsistent.

It is undisputed that a building permit issued for the property in July 1977. As the City points out, if the mere issuance of a building permit subjects a property to the RSO— a property on which construction has not even begun—then the amendment would "capture many properties" that had not been subject to the RSO under its pre-2017 terms. This is obvious and indisputable: so read, the RSO would expand its sweep to cover not only buildings for which a certificate of

---

[1]    Civ. Code, § 1954.50 et seq. (the Costa-Hawkins Act or the Act). The Costa-Hawkins Act was enacted in August 1995. (*Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (2009) 175 Cal.App.4th 1396, 1405.)

occupancy or temporary certificate of occupancy issued before October 1, 1978, but also buildings that were not occupied or approved for occupancy before October 1, 1978 because the ground had yet to be broken.[2]

Quoting selectively, appellants mischaracterize the relevant deposition testimony. The City Council amended the RSO in 2011 and again in 2017 to add language about building permits. In 2011 the City added a phrase that a "housing accommodation" would be subject to the RSO "if relevant documentation, such as a building permit, establishes that the building was first occupied for residential purposes prior to October 1, 1978." In 2017 the City Council deleted this language and added this sentence: "If the property was issued a building permit for residential purposes at any time on or before October 1, 1978, and a Certificate of Occupancy for the building was never issued or was not issued until after October 1, 1978, the housing accommodation shall be subject to the provisions of this chapter."

Anna Ortega, the Director of Rent Stabilization at the City's Housing and Community Investment Department (HCID), testified about these amendments. In response to appellants' counsel's questions, she explained the exemption from the RSO (now contained in paragraph 6 of the definition of "Rental Units" in section 151.02 of the ordinance) was meant to be for new construction. Some buildings had existed long before October 1, 1978—the property at issue here of course was not one of them— but had no certificate of occupancy. The City Council didn't

---

[2]     The issuance of a building permit means "[t]he applicant can start construction."

2

mean to exempt those older buildings.  So HCID recommended the amendments "to talk about if relevant documentation, such as a building permit, establishes that it was first occupied for residential purposes."  Ortega continued, "We were really concerned with old housing from the '20s or even before the '50s and for whatever reason it didn't get a certificate of occupancy but were clearly old housing in existence on October 1st, 1978, and used for residential purposes."

Ortega testified a building permit, by itself, wouldn't establish the building was "first occupied for residential purposes" before October 1, 1978, but "a series of permits from decades past" would tend to show the building wasn't new construction.  Ortega listed documents other than a certificate of occupancy that could be used to establish the date of first occupancy:  phone records, Department of Water and Power records, advertisements, and "other kinds of records from [the Department of] Building and Safety other than a permit."  By contrast, Ortega testified, a Request for Modification of Building Ordinance like the one at issue here—even if granted—is insufficient to establish "the first date" for "legal habitation."  According to Ortega, it "doesn't prove anything"—"[o]nly that a request was filed."

Ortega explained it was not the City Council's intent to expand the universe of properties subject to the RSO; HCID and the Council didn't mean to "chang[e] anything" as far as the number of units subject to it.  But, Ortega acknowledged, the broad "building permit" language in the 2017 amendment "overreached."  The amendment "was meant to address . . . old housing that had been occupied and rented"—again, the property here wasn't that—"not housing on the cusp."

3

As the majority notes, our review is de novo and we are not bound by the trial court's conclusions.  However, applying this de novo standard, I find Judge Beckloff's analysis, reasoning, and conclusions sound.  If the issuance of a building permit alone subjects a property to the RSO, then the 2017 amendment sweeps within its scope properties that otherwise wouldn't be subject to the ordinance, and it potentially runs afoul of the Costa-Hawkins Act.[3]  To read the amendment's language more narrowly to save it from preemption, a court must interpret it to mean a building permit is not enough when there's no evidence the property was approved for occupancy or actually occupied before October 1, 1978.  As Judge Beckloff found, the record here does not establish the property was approved for occupancy or occupied before the critical October 1 date.

Appellants rely on a form Request for Modification of Building Ordinances for the property, dated February 16, 1978.  Under "Request" is typed "Temporary Certificate of Occupancy." Under "Justification" is typed "Pending completion of elect. work

---

[3]     *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, cited by the majority, involved a conflict between two statutes:  the Costa-Hawkins Act and the Ellis Act, Government Code section 7060 et seq. (*Apartment Assn.*, at p. 18.)  As Justice Kitching noted, the Costa-Hawkins Act was enacted after the Ellis Act.  The Ellis Act specifically authorized the City to enact the ordinance at issue in *Apartment Assn.* (*Ibid.*)  That ordinance provided, if a landlord demolished residential property subject to the City's rent control law, and built new residential rental units on the same property within five years, the newly constructed units also were subject to the rent control law. (*Id.* at p. 17.)  Here, of course, we are dealing not with a conflict between two statutes, but between a statute and an ordinance.

4

on pool."  A box entitled "Granted" is checked and dated the same day.  Under "Conditions of Approval" is handwritten "C/O."

The parties disagree about what inference should be drawn from the fact that the request was "granted" the same day it was filed.  Appellants argue it must mean an inspector "already [had] performed the required verification" of "life and safety regulations"—before the request even was submitted.  The City argues "the record suggests that the City would not issue a temporary certificate of occupancy on the same date it received" the request and the "grant" might mean only that the City had "simply granted the request to inspect the property."

Again, the deposition testimony does little to solve this mystery.  Catherine Nuezca Gaba is the Chief of the Permitting and Engineering Bureau within the Department of Building and Safety.  Gaba explained "[a] temporary certificate of occupancy allows occupancy only for a small duration of time until the applicant or the contractor completes what's necessary to give [*sic*] a certificate of occupancy."  When asked, "Is it fair to say that between 1966 and 1979, the City of Los Angeles issued a certificate of occupancy automatically upon inspection of a building assuming that the building met relevant safety and other requirements?", Gaba responded, "Correct."  Gaba said, in those years, someone who wanted a temporary certificate of occupancy would request "a modification," "a deviation from the code."

Appellants' counsel asked Gaba, "If the request for modification of building ordinance seeking a temporary certificate of occupancy had been granted in either 1977 or 1978, what, if anything, would have happened next in terms of the issuance of a temporary certificate of occupancy?"  Gaba answered, "The

5

inspector would have to verify that the building meets the life and safety regulations." Gaba then testified she "would not know" whether in 1977 and 1978 a "request for modification of building ordinance seeking a temporary certificate of occupancy would have been granted before an inspection of the building . . . that was the subject of the request." She added, "It would be a guess to anyone."

Appellants' counsel asked Gaba whether—once the inspector had inspected the building and found it met all requirements—the Department "would have issued a subsequent document that was called [a] temporary certificate of occupancy." Gaba answered, "Yes." Later in her deposition, Gaba said the check mark in the "granted" box meant "the request had been granted." Counsel asked, "So the request for modification of building ordinance was granted . . . so that a temporary certificate of occupancy could be issued[?]", and Gaba responded, "Correct." When asked again, "[W]as a separate document called temporary certificate of occupancy issued on the basis of the decision to grant this request?", Gaba said, "I would not know." Gaba testified there was no indication in the file that the property was being used or occupied for residential purposes before the certificate of occupancy issued on October 16, 1978.

With their reply brief in the trial court, appellants submitted a declaration by current tenant Holly Morris, attaching February 1978 classified advertisements from the Valley News, as well as a declaration by a woman named Sylvia Manders. Manders declared she had lived at the property "beginning on a date prior to October 1, 1978." The owner's counsel objected to this submission of new evidence in a reply. Judge Beckloff concluded the parties should be permitted to

6

submit their evidence to HCID on the issue of "whether the Property could have been occupied or was occupied prior to October 1, 1978." Accordingly, on August 15, 2019, the court remanded the matter to HCID.

In a November 15, 2019 letter to appellants' counsel, HCID reported it had completed "a further review of the applicability of RSO to this property." HCID listed the "documentation" submitted by counsel for appellants[4] and the owner. The owner had submitted a report from a private investigator that "there was no evidence [Manders] resided at the complex in 1978." The relevant telephone company (AT&T/Pacific Bell) advised the investigator "that no phone records existed at the complex prior to October 1, 1978" and "no active telephone connections were available in any of the units" before that date. Neither the Department of Water and Power nor Edison had any records for any individuals "registering" for accounts at the property. Department of Motor Vehicle records for 1978 and 1979 did not show Manders ever gave the property as her address. Nor did Social Security Administration records or voter registration records. HCID noted Manders attached "no supporting documents" to her declaration.[5] As for the newspaper

---

[4]    Even though appellants represented to Judge Beckloff that they had "found and spoken with people over the last few months . . . who have confirmed . . . they indeed lived at the Property prior to October 1978," Manders's declaration was apparently the only one they submitted to HCID of someone who claimed to have lived there before October 1, 1978.

[5]    Appellants assert the investigator searched for a "Silvia Manders" when Manders's name at the time was "Silvia Lefitz." Appellants are mistaken. First, the declaration appellants

7

advertisements appellants submitted, HCID noted the property developer first advertised the "Grand Opening" on February 10, 1978, six days before the request for modification was filed. In HCID's view, these "advertise[ments] for reservations" did not "demonstrate that any units were rented and occupied prior to the pivotal date of October 1, 1978."

Finally, we are not talking here about the mere failure of a government agency to locate a piece of paper in its files from some 43 years ago. No one seems to know if a temporary certificate of occupancy issued and was lost, or never was issued at all. But the record also includes a computer run of all Department of Building and Safety-issued documents on the property.[6] The report shows building permits for dates ranging from February 1926[7] to March 2002, certificates of

themselves submitted—signed by Manders—spells her first name "Sylvia," not "Silvia." Second, HCID's summary of the investigator's submission does not say he searched by that *name*, only that he searched for that *person*. HCID's summary specifically states the investigator searched Social Security Administration records "with respect to Ms. Manders (and all other names used by her)," as well as voter registration records for "Manders (and Lefitz) for 1974 through 1984."

[6] The City described this document as "a printout of the [Department of Building and Safety's] Online Document Search: Summary Report for the Property, which report identifies all of [the Department's] forms and documents on file for the Property as of March 27, 2019."

[7] The record does not reflect what sort of building—if any— was on the property between 1926 and 1977 when the apartments at issue began construction.

8

occupancy dated October 16, 1978, and several other documents referred to as "BAAB BOARD FILE" (dated 1977-1978), "EARTHQUAKE" (dated 1994), and "RECORDED DOCUMENT" (dated 1995 and 1997). Nowhere does this computerized list of all documents issued on the property include a temporary certificate of occupancy.[8] One would think that, if a temporary

---

[8] HCID's July 1, 2016 letter to the owner stated, "Property records indicate that a Temporary Certificate of Occupancy 1977VN60384 was issued February 16, 1978." But the Department's computer printout identifies document number 1977VN60384 as both a "BUILDING PERMIT," dated July 11, 1977, and a "CERTIFICATE OF OCCUPANCY," issued October 16, 1978.

9

certificate of occupancy had issued in February 1978, it would have been reflected in the Department's computerized files of "all documents" for the property.[9]

---

[9] Neither appellants nor the City have cited Evidence Code section 664. Accordingly, we do not have the benefit of briefing on the question of whether the presumption that an "official duty has been regularly performed" applies and, if so, what we should presume. Should we presume the City inspected the property in February 1978 and did not issue a temporary certificate of occupancy because there was some outstanding issue? Or that the property passed inspection and a temporary certificate of occupancy issued even though it does not appear in the Department's computerized records? I agree that—if it's the case the property was not in fact subject to the RSO—it is surprising it took someone until 2016 to figure that out. But to draw from that inaction and the passage of time a presumption that the City in 1978 correctly determined the property was subject to the RSO strikes me as an estoppel or laches theory. Estoppel against a governmental entity is subject to very particular requirements. (See generally *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261-1264.)

In short, on this record we simply do not and cannot know what happened in 1978. Both parties want us to speculate. Courts are not in the business of speculation. When the evidence leaves this sort of uncertainty about the facts, the question is which party bears the burden of proof. Those parties here—despite their protestations—are appellants. Judge Beckloff, whose careful and thorough consideration of the entire record and all of the arguments in this case is evident, concluded "the court has no evidence . . . an inspection occurred or the results of such an inspection, even assuming one did occur," and thus appellants had "not persuaded the court that the evidence suggests the Property is subject to the RSO." I agree with him.


EGERTON, J.